**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | **Case No:  23-mj-239** |
| | **:** | |
| **EDWARD RICHMOND, JR.** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**GOVERNMENT'S EMERGENCY MOTION**
**FOR STAY AND REVIEW OF RELEASE**
**ORDER**

The United States of America, by and through its attorney, the United States Attorney

for the District of Columbia, respectfully moves this Court to stay the order of a magistrate judge

in the Middle District of Louisiana releasing defendant Edward Richmond, and, second, review

the magistrate judge's decision to deny the government's motion for pre-trial detention.

Richmond has a previous manslaughter conviction for shooting a handcuffed man in the head;

on January 6, he brought a metal baton to the Capitol and used to commit brutal assaults on

officers.  When the FBI arrested him—an arrest that was complicated by Richmond's efforts to

live an untraceable life "off the grid"—they discovered an assault rifle in his closet.   Richmond

poses both a danger and a risk of nonappearance, and the Court should detain him pending trial.

The government is concerned that, under growing pressure, he may snap again.

**I.      BACKGROUND**

**A.      Procedural Posture**

On January 22, 2024, defendant Edward Richmond was arrested in his home state of

Louisiana on an arrest warrant issued in this district, signed by Magistrate Judge Zia M. Faruqui,

in connection with a complaint charging him with Assaulting an Officer with a Deadly Weapon,

in violation of 18 U.S.C. §§ 111(a)(1) and (b), Civil Disorder, in violation of 18 U.S.C. §

1

231(a)(3), Knowingly Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A), Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2), Engaging in a Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4), and Violent Entry and Disorderly Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(F).

This morning, at his initial appearance in the Middle District of Louisiana, the government made a motion to detain the defendant pending trial.  The presiding magistrate judge denied the government's detention motion and issued an order releasing the defendant with certain conditions.  *United States v. Edward Richmond, Jr.*, M.D. La. Case No. 24-mj-00006 (UNA), ECF 4.  The government understands that the defendant was released this evening.

    **B.**    **Statement of Facts**

The Court is familiar with the background regarding the January 6, 2021 attack at the United States Capitol, so the government will not repeat it here, but incorporates the background section of the criminal complaint filed in *United States v. Richmond,* No. 23-mj-239.

On January 6, 2021, Richmond came to the Capitol dressed in full tactical gear, carrying a baton.





As captured on CCTV and body worn camera video, Richmond attacked officers in the Lower West Terrace Tunnel, the scene of the most violent battles on January 6.  Richmond stayed at the front of the mob fighting against police for almost two hours—from approximately

3:15pm to 4:57pm.  During this time, Richmond participated in the efforts against police inside the tunnel, trying to break the police line.  Richmond then carried out a police riot shield from the tunnel out into the mob and passed back police helmets to the mob as well.  Richmond helped take furniture out of broken windows from the Capitol, and threw what appears to be a white board into the tunnel at officers.

Richmond also carried a large wooden plank—positioning it against officers in the tunnel.





Richmond also participated in several extremely violent attacks on police officers at the mouth of the tunnel.

At approximately 4:27pm, Richmond participated in the assault against officers who have fallen and the crowd is attempting to drag out away from the police line.





He was also right in the vicinity as Officer Michael Fanone was dragged into the crowd in front of the tunnel.



By 4:57pm, Richmond approached the tunnel again and raised his baton up high—poised to attack officers—before bringing it down on officers at least twice.





*Defendant's Criminal History*

In 2004, Richmond—after joining the United States Army—was convicted of manslaughter after shooting a handcuffed Iraqi cow herder in the head with his rifle.  Richmond was sentenced to three years of military confinement and dishonorably discharged.  He was also previously convicted of disturbing the peace (2000), resisting officers (2000), and driving under the influence (2001).  He was also arrested, but not convicted, of cocaine and marijuana possession (2001) and resisting arrest (2001).

*Attempts to Locate Defendant's Residence*

Richmond appears to have been living under the radar.  The government understands he

works for his father, but has no income that the FBI was able to trace.  His current driver's license and utilities (such as his cell phone) list addresses different from the apartment FBI ultimately identified as his residence.  The FBI also attempted to find Richmond through their mail contacts—but there were no packages addressed to a current address and no P.O box. Eventually, through physical surveillance, the FBI was able to locate the defendant's apartment. Even his truck, which was first used to visually place him at the apartment, was registered to an LLC, which lists a different address.

*Discovery of Firearms and Ammunition at Defendant's Apartment*

On January 22, 2024, the FBI found Richmond at his apartment, arrested him, and searched the apartment pursuant to a warrant issued in the Middle District of Louisiana.  Given his criminal history, Richmond is not legally allowed to possess firearms.  However, at his apartment, the FBI discovered an AR-15 rifle in Richmond's home—complete with three fully loaded magazines, approximately 73 rounds of ammunition.  The AR-15 found in Richmond's

home is pictured below:







**C.      Release Order**

After an initial appearance and hearing in the Middle District of Louisiana on January 23, 2024, the presiding magistrate judge issued an Order of Release for the defendant.  The magistrate judge did not require GPS monitoring or impose a curfew; rather, the defendant must attend anger management and other treatment as directed by pretrial services, among other standard conditions.  On that same day, the United States orally objected to the finding of facts and the order granting the defendant's release.

**III.    ARGUMENT**

**A.      Legal Standard**

Title 18, U.S.C. § 3145(a) states:

**(a) Review of a release order –** If a person is ordered released by a magistrate, …

> (1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release . . .

The motion shall be determined promptly.

On the government's motion to review a release order, this Court considers *de novo* the Magistrate Judge's denial of pre-trial detention.  In its discretion, the Court may proceed to rehear the evidence by recalling the witnesses, reviewing transcripts, or by proceeding through proffer and argument.  It may take additional evidence from new witnesses or consider arguments not previously raised.  In short, the Court may proceed as best enables it to resolve the question posed:  whether any condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.  As the legislative history of the 1984 Bail Reform Act amendments shows:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving violence. . . .

See S. Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182,  3195-3196.[1]

---

[1] To that end, it is worthwhile recalling Congress' intent in 1984 when it enacted the current version of the Bail Reform Act:

> Many of the changes in the Bail Reform Act reflect the . . . determination that Federal bail laws must . . . give the courts adequate authority to make release decisions that give appropriate

As the D.C. Circuit recently stated in *United States v. Munchel*, "[t]o justify detention on the basis of dangerousness, the government must prove by 'clear and convincing evidence' that 'no condition or combination of conditions will reasonably assure the safety of any other person and the community.' " 991 F.3d 1273, 1279–80 (D.C. Cir. 2021) (quoting 18 U.S.C. § 3142(f)). "When the basis for pretrial detention is the defendant's risk of flight, the government is required to demonstrate the appropriateness of detention . . . by a preponderance of the evidence." *United States v. Sabol*, 2021 WL 1405945, at *4 (D.D.C. Apr. 14, 2021) (citing *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996)).

Richmond is eligible for detention under 18 U.S.C. § 3142(f)(1)(A)/(E) because he is charged with a violation of 18 U.S.C. § 111(b) (a crime of violence, which involved a dangerous weapon) and 18 U.S.C. § 3142(f)(2) because he is flight risk. The government seeks detention on both grounds. A review of the 3142(g) factors makes clear that no condition or combinations of conditions will assure the safety of the community if the defendant were to be released. In addition, the defendant poses a risk of nonappearance, given his apparent effort to live an untraceable life outside the formal economy.

---

recognition to the danger a person may pose to others if released. . . . The constraints of the Bail Reform Act fail to grant the Courts the authority to impose conditions of release geared toward assuring community safety, or the authority to deny release to those defendants who pose an especially grave risk to the safety of the community. . . . *This broad base of support for giving judges the authority to weigh risks to community safety in pretrial release decisions is a reflection of the deep public concern, which the Committee shares, about the growing problem of crimes committed by persons on release.*

See S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3486-3487. (Emphasis added.)

**B.**      <u>**The Nature and Circumstances of this Offense Merits Detention.**</u>

The nature and circumstances of the offense heavily favor detention.  During the course of the violent siege of the U.S. Capitol on January 6, 2021, over 100 law enforcement officers reported being assaulted or injured by the violent mob while attempting to protect the U.S. Capitol and the individuals inside of the building. These assaults occurred both inside of the Capitol, as well as on the steps outside of the Capitol and the grounds of the Capitol, where the enormous mob included numerous individuals with weapons, bulletproof vests, and pepper spray who were targeting the officers protecting the Capitol.  Additionally, the violent crowd encouraged others in the crowd to work together to overwhelm law enforcement and gain unlawful entry into the U.S. Capitol.  What is extremely troubling about the defendant's role in this attack is his deliberate action and the viciousness.  He wore full-body tactical gear and armed himself on January 6.  He was at President Trump's rally with a group, and other members of his group returned to their hotel after the rally.  But Richmond did not.  He instead chose to go to the Capitol, dressed for battle, and attack.

Richmond spent almost two hours attacking officers inside and at the mouth of the tunnel—participating in and bearing witness to some of the most violent attacks on law enforcement that day.  After fighting against police in the tunnel, Richmond carried a police shield out to the crowd, and passed back a police helmet taken from police in the tunnel as well.  Richmond used a long wooden board to position against police attempting to guard the tunnel, and then threw an object that looked like a white board at officers trying to defend the Capitol.  Ultimately, Richmond used a baton to strike at officers at the mouth of the tunnel.

**C.**      <u>**The Weight of the Evidence Favors Detention**</u>

The evidence in this case is strong. [2]  Richmond was identified by multiple sources, including two confidential witnesses with personal knowledge of the defendant.  He also does not contest his identity.  Richmond is captured on U.S. Capitol surveillance cameras, body worn camera, and on dozens of social media videos and media footage attacking law enforcement officers and attempting to unlawfully enter the U.S. Capitol.  When evaluating the evidence presented at the detention hearing held on January 23, 2024, while ultimately weighing other factors in favor of release, the Magistrate stated that the "nature and circumstances of the offense and weight of the evidence weigh in favor of detention . . . ."  *United States v. Edward Richmond, Jr.*, M.D. La. Case No. 24-mj-00006, ECF 4, at 3.  The government agrees.  The evidence against this defendant is overwhelmingly strong, and accordingly, the weight of the evidence weighs heavily in favor of detention.

> ### D.  Defendant's History and Characteristics Merit Detention

The third factor, the defendant's history and characteristics, likewise weighs in favor of detention.  The defendant has a manslaughter conviction for killing an Iraqi civilian, a cow-herder who was handcuffed at the time.  He shot his victim in the head.  Killing another person is perhaps the most serious offense recognized under the law.  Despite being prohibited from possessing firearms, Richmond has chosen to arm himself again—with an assault rifle.

---

[2] While some judges in this Court have indicated that this factor should be given less weight, in *United States v. Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, then Chief Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors."  2023 WL 1778194, at *8. Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate."  *Id.* at *10. In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). The Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). This Court should follow *Blackson* and *Zhang;* this factor should be given no less weight than any other factor.

His other arrests, while dated, contain other examples of lashing out under pressure, such as when Richmond was arrested for drug possession and reacted by committing a battery against the police, leading to more charges.  January 6 was not a one-time, innocent mistake, but rather one example of a pattern of dangerous behavior; of responding to tense situations with violence.

Moreover, this is not a defendant who proactively approached the FBI and turned himself in.  While his attorney did reach out to the FBI in January 2022, it was only in reaction to the defendant hearing that the FBI had interviewed those close to him—and Richmond did not turn himself in at that point.  Rather, it appears that Richmond tried to live under the radar.  His income was untraceable; his driver's license and utilities did not return to his address.  The FBI could also find no address through the mail—no packages, no P.O box, etc.

The government understands that Richmond has a child and that his parents live in the area.  These relatives may be a source of community support.  But this support did not dissuade him from committing crimes on January 6 or keeping an assault rifle and over 70 rounds of ammunition in three fully loaded magazines in the same home that he shares with his child, knowing that he is breaking the law and risking arrest by doing so.  Moreover, the government understands that his employment with his father has been under-the-table, enabling Richmond to avoid being pinned down to an exact location for nearly three years, having first been identified by FBI in February 2021.

E.    **Richmond Presents a Danger to the Community.**

The fourth factor similarly favors detention.  The charged offenses involve violent assaultive conduct.  The defendant assisted a mob trying to break into the U.S. Capitol and stop the functioning of our government as it met to certify election results. The danger the defendant caused by assisting the violent mob cannot be understated.  The defendant was a spoke in the wheel

that caused the historic events of January 6, 2021, and he is thus a danger to our society and a threat to the peaceful functioning of our community—even more so now that we have entered another presidential election year, a year that may provoke the same reactions all over again.

   Richmond's dangerous conduct, of course, did not start on January 6, and it did not end there. He has attacked officers before.  He has killed a man—an unarmed, handcuffed man, a civilian—before.  And he has now felt it necessary to arm himself with an assault rifle and over 70 rounds of ammunition in total defiance of the law.[3]  Richmond knows that a gun can irrevocably destroy lives.  This did not deter him from possessing an assault weapon.  He served multiple years in jail for shooting a man and was undoubtedly aware that the any future possession of firearms could send him back to jail.  This did not deter him.  He cannot be trusted to follow the law, and he cannot be trusted not to lash out again.

### E.       Richmond Poses a Flight Risk

         Further, the government has shown by a preponderance of the evidence that—now that Richmond has been arrested—he poses a flight risk.  Since 2021, Richmond has been taking steps to lay low after his participation in the January 6 riot, starting immediately after January 6, 2021 and continuing through his arrest.  First, Richmond dropped his telephone number—the one used multiple times during January 6, 2021—on February 5, 2021, after photos of Richmond were posted online by the FBI as BOLO 182.  Second, by moving to an apartment that has virtually no paper trial identifiable by the FBI, including no active driver's license, no utilities or vehicles in his name, and no traceable income, Richmond succeeded in preventing the FBI from verifying his address through any written means.

---

[3] The Middle District of Louisiana has not yet filed charges related to Richmond's possession of the firearm, but told Richmond, through his counsel, in Louisiana that it was likely to move forward with charges.  Facing serious felony charges in multiple jurisdictions could increase Richmond's incentive to flee.

## **CONCLUSION**

For all the foregoing reasons, the Government respectfully requests that the Court reverse

the magistrate judge's order releasing the defendant and detain him pending trial.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     */s/ Victoria A. Sheets*
Victoria A. Sheets
Assistant United States Attorney
NY Bar No. 5548623
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Office Tel.:  202-252-7566
Email: vsheets@usa.doj.gov